(June 2, 1902.)

## SWEET v. BALLENTYNE.

[69 Pac. 995.]

CONSTITUTIONAL LAW—POLICE POWER OF THE STATE—REGULATION OF
SHEEP GRAZING.—Sections 1210 and 1211 of the Revised Statutes
of Idaho, prohibiting the grazing and herding of sheep within two
miles of inhabited dwellings, is a valid exercise of the police
power of the state. Affirming *Sifers v. Johnson*, 65 Pac. 709.

SAME—DAMAGES.—Under said statutes, the owner or herder of sneep
is only liable for the damages which are caused in the commission
of a trespass by his own sheep.

SAME.—In estimating the damages caused to a settler by herding and
grazing sheep within two miles of his dwelling, and on the public
lands, the number of livestock which he has depending on pastur-
age upon said lands must be taken into consideration.

\Syllabus by Quarles, C. J.)

APPEAL from the District Court, Boise County.

J. J. Blake and W. E. Borah, for Appellant.

It is practically impossible to find an authority directly in
point upon this question, but the principles enunciated by many
of the cases would seem to control. In the case below it was
held that a party being compelled to sacrifice his property by
sale is not an element of damage. (*Savings Bank v. Ashbury,*
117 Cal. 96, 48 Pac. 1081.)   So it has been held that the loss
of a crop by reason of an employee quitting work is remote dam-
ages. (*Macy v. Peach,* 21 Kan. App. 575, 44 Pac. 687.)   The
measure of damages for destroying hay by fire is its market
value, less the cost of marketing. (*Watt v. Nev. Cent. R. Co.,*
23 Nev. 154, 62 Am. St. Rep. 772, 44 Pac. 423, 46 Pac. 52, 726;
*Hopkins v. Commercial Co.,* 16 Mont. 356, 40 Pac. 865; *Shot-
well v. Dodge,* 8 Wash. 337; 36 Pac. 254; 3 Sedgwick on Dam-
ages, secs. 933-937; *Hartshorn v. Chaddock,* 135 N. Y. 116, 31
N. E. 997, 17 L. R. A. 426.)   Damages caused by defendant's
sheep grazing on the public land: "The ordinary and, in gen-
eral, the only legal course is to lay such facts before the jury

as have a bearing on the question of damages and leave them
to fix the amount. They are impartial and capable of enter-
ing into these ordinary matters. Witnesses are in such cases
unavoidably governed by their feelings and their prejudices
gathered from many sources. (*Norman v. Wells,* 17 Wend.
136; *Old v. Keener,* 22 Colo. 6, 43 Pac. 127; *A. T. & S. F. Co.
v. Snedeger,* 5 Kan. App. 700, 49 Pac. 103; *Van Deusen v.
Young,* 29 N. Y. 10; *Morehouse v. Mathews,* 7 N. Y. 514;
*Tingley v. City,* 8 R. I. 493; *Clardy v. Calicoate,* 24 Tex. 170;
*Thompkins v. Toland,* 46 Tex. 584; *Blair v. Railway Co.,* 20
Wis. 262; *I. C. Ry. Co. v. Smith,* 22 Ky. App. 1655, 61 S. W.
2; *Jones v. I. C. Ry. Co.,* 14 Am. & Eng. Ry. Cas. 839; *G. W.
T. Co. v. Staton* (Tex. Civ.), 49 S. W. 277; *Largan v. C. R.
Co.,* 40 Cal. 272; *Graney v. S. T. L. Co.,* 157 Mo. 666, 57 S. W.
276, 50 L. R. A. 153.) Constitutionality of the law: No duty
rests more imperatively upon the courts than the enforcement
of those constitutional provisions intended to secure that equal-
ity of rights which is the foundation of their government." (*G.
C. & S. F. Co. v. Ellis,* 165 U. S. 150, 17 Sup. Ct. Rep. 255.)
The same authority quotes with approval the following lan-
guage: "Whether a statute be public or private, general or spe-
cial, in form, if it attempts to create distinctions and classifi-
cations between the citizens of this state, the basis of such classi-
fication must be natural and not arbitrary." (*Yick Wo v. Hop-
kins,* 118 U. S. 356, 6 Sup. Ct. Rep. 1064.) Let us examine
the law a moment. Section 1210 says: "It is unlawful for
any person owning or having charge of sheep . . . . to herd
the same, or to permit them to graze, within two miles of the
dwelling-house of the owner or owners of such possessory
claims." In the first place the *ipsi dixit* of the legislature pur-
ports to make the grazing of sheep a crime, unlawful at least,
while the grazing of horses or of mules or of cattle is not so.
Thus such owners of herds have free access to this range. It
costs them nothing, and if their herds eat the grass no one can
recover from them for it. If a statute purporting to have been
enacted to protect the public health, public morals or the public
safety has no real or substantial relation to those objects, or is
a palpable invasion of rights secured by the fundamental law,

it is the duty of the courts to so adjudge, and thereby give effect to the constitution." (*Ex parte Whitwell,* 98 Cal. 73, 35 Am. St. Rep. 152, 32 Pac. 871; *State v. Speyer,* 67 Vt. 502, 48 Am. St. Rep. 832, 32 Atl. 476, 29 L. R. A. 573; *Dibrell v. Lanier,* 89 Tenn. 497, 15 S. W. 87, 12 L. R. A. 70; *State v. Walsh,* 136 Mo. 400, 37 S.W. 1112, 35 L. R. A. 231; *Ex parte Jentzsch,* 112 Cal. 468, 44 Pac. 803, 32 L. R. A. 664; *Sutton v. State,* 96 Tenn. 696, 36 S. W. 697, 33 L. R. A. 589; *Frorer v. People,* 141 Ill. 171, 31 N. E. 395, 16 L. R. A. 492; *In re Hong Wah,* 82 Fed. 623; *In re Sam Ke,* 31 Fed. 681; *Smiley v. McDonald,* 42 Neb. 5, 47 Am. St. Rep. 689, 60 N. W. 355.) The legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupation. In other words, its determination as what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts." (*Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. Rep. 499; Cooley's Constitutional Limitations, 1st ed., 391; *People v. Gillson,* 109 N. Y. 389, 4 Am. St. Rep. 465, 17 N. E. 343; *Health Department v. Rector,* 145 N. Y. 32, 45 Am. St. Rep. 579, 39 N. E. 833.)

Hawley & Puckett, for Respondent.

In a case of this character damage may occur in many different ways, as is shown by the evidence in this case; as, for instance, destroying the grass, causing plaintiff's stock to stray away, thereby making it necessary to spend time and money to gather them, and also making it necessary to feed stock where otherwise they would live off the grass, but they all spring from the violation of the law, to wit, herding or permitting sheep to be herded on the land or possessory claim of another, or to graze or permit them to graze within two miles of the dwelling-house of the owner of such possessory claim. (*Sifers v. Johnson,* 7 Idaho, 798, 97 Am. St. Rep. 271, 65 Pac. 709.)

QUARLES, C. J.—The appellant was sued in the justice's court of Lower Squaw Creek precinct, in and for Boise county, for damages alleged to have been sustained by the respondent

by reason of appellant having herded and grazed his sheep upon the lands of the respondent, and within two miles of the residence of the respondent; the damages being alleged to be the sum of $200. On a trial in said justice's court, respondent recovered judgment, and appellant appealed to the district court, and upon a trial in said district court the respondent recovered a verdict and judgment in the sum of $100 and costs. The appellant moved for a new trial in the court below, which was denied, and has appealed to this court from the order denying a new trial, and from the judgment.

The grounds upon which the appellant moved for a new trial, and upon which we are asked to reverse the judgment, are, in brief, that the judgment is contrary to law, and against the evidence.

Upon the first ground named above the appellant attacks the constitutionality of sections 1210, 1211 of the Revised Statutes of 1887. It is contended by appellant that the said sections violate the fourteenth amendment of the federal constitution; that "it denies to the defendant, and those who come under the statute, equal protection under the law, and deprives them of property without due process of law." The able counsel for appellant argues that the said statutes are dealing with an industry regarded as legitimate, and that sheep-raising and sheep-grazing are "not yet criminal *per se,* and are industries which are recognized as a rightful and important industry of the state, constituting a basis for legitimate wealth within the state." This argument has so often been made, and so often rejected by the courts, notably in cases growing out of laws prohibiting the sale of intoxicating liquors, that it is hardly necessary to pursue it here. In *Sifers v. Johnson,* 7 Idaho, 798, 97 Am. St. Rep. 271, 65 Pac. 709, 54 L. R. A. 785, we held said statutes to be constitutional and a valid exercise of the police power of the state. We are now asked to overrule that decision. Public interests require that statutory and constitutional construction should be uniform, and not vacillating. Having held said statute valid, nothing but the most serious considerations, such as having unquestionably enunciated a rule which is contrary to au-

thority and reason, will justify the court in reversing its former ruling and laying down a different construction. As said in *Sifers v. Johnson, supra,* "the police power of the state is very great." It has also been said by another authority: "The police power includes all measures for the protection of the life, the health, the property, and the welfare of the inhabitants, and for the promotion of good order and public morals." (See "The Police Powers of the State," pages 98 and 99, by Mr. Russell, and authorities cited by him in the notes.) The statutes in question were enacted for the protection of the health, the property, and welfare of the inhabitants of this state, and to promote good order. The statutes cited make it unlawful to herd or graze sheep on the lands of another, or within two miles of the dwelling of another. This is not a new, but an old, statutory regulation in this state. These statutes, identical with their present reading, were enacted while Idaho was a territory, and first in 1875, when they were enacted as local statutes applying to Alturas, Ada, and Boise counties. (See Idaho Laws, Ninth Sess., p. 110.) By act of January 31, 1883, it was extended to Cassia county. By act of February 13, 1879, it was extended to Nez Perces county. And in 1887 said statutes were made general, and incorporated into the general laws of the state as a part of the Revised Statutes. These statutes were continued in force by the schedule in our state constitution. The act of Congress admitting Idaho as a state accepted and ratified our state constitution, and Idaho was admitted a sovereign state without restriction upon her powers as such. We cannot concede that the police powers of the state do not extend over the public lands within the state.

In his work upon State and Federal Control of Persons and Property, Mr. Tiedeman tersely expresses the rules governing in cases of such statutes. (See quotation from this author in *Sifers v. Johnson, supra.*) It is a matter of public history in this state that conflicts between sheep owners and cattlemen and settlers were of frequent occurrence, resulting in violent breaches of the peace. It is also a matter of public history of the state that sheep are not only able to hold their

own on the public ranges with other livestock, but will in the
end drive other stock off the range, and that the herding of
sheep upon certain territory is an appropriation of it almost
as fully as if it was actually inclosed by fences, and this is espe-
cially true with reference to cattle. The legislature did not
deem it necessary to forbid the running at large of sheep alto-
gether, recognizing the fact that there are in the state large
areas of land uninhabited, where sheep can range without inter-
fering with the health or subsistence of settlers, or interrupting
the public peace. The fact was also recognized by the legis-
lature that, in order to make the settlement of our small iso-
lated valleys possible, it was necessary to provide some protec-
tion to the settler against the innumerable bands of sheep graz-
ing in this state. Settlers need the use of the range in their
immediate vicinity for their domestic animals. Families living
on small farms must of necessity keep some livestock. A milch
cow is a necessity to the isolated family living on a small farm
miles from market. Recognizing that if sheep were permitted
to graze at will in the settled portions of the state, settlers could
not go into the small valleys and build up homes, the legislature
passed the statutes in question in order to encourage the settle-
ment of wild lands in this state. Moreover, the said statutes
were passed to promote good order, and preserve the public
peace, and to prevent those recurring conflicts between settlers
and the owners and herders of sheep so common in the past.
Viewed as a measure to preserve good order and peace, to pre-
vent conflicts which violate the peace, to protect the health and
comfort of citizens of the state, and to promote and encourage
the settlement and development of the state, the said statutes
are wise and beneficent, and must be so recognized by all per-
sons who are acquainted with the conditions in this state, past
and present. Nullify the statutes in question, or emasculate
their provisions by holding that they are unconstitutional, or
that a settler cannot recover damages by reason of sheep destroy-
ing all the forage grasses around him, and the beneficent objects
of the statutes are defeated; and the result will be, in the end,
that isolated settlements must be abandoned, and the land in

the state become one immense sheep pasture, to the detriment of the farming and mining interests; and settlement of the public lands will be retarded; the building up of homes on the public domain will almost stop.   Now, it is the policy of our laws, both state and federal, to encourage the settlement of the public lands and the building of homes thereon.   This is a wise policy, and in its furtherance the statutes in question were enacted. And in line with said policy the federal government has not only held out inducements to settlers to locate upon the public lands, surveyed and unsurveyed, but has made it a criminal offense for any persons or person to fence any of the public lands of the United States, except where they in good faith intend to acquire title thereto under the land laws of the United States.

The contentions of appellant are to some extent inconsistent. He argues that sheep-men have a right to pasture the public domain, and have a property interest in the grasses growing thereon, and at the same time contends that settlers do not own the grass on the public land within two miles of their residences, and cannot recover damages for loss of such grass when destroyed by sheep in violation of the statutes.   The argument proves too much.   If the statutes in question violate the fourteenth amendment of the constitution by depriving sheep owners of property grass within two miles of dwellings without due process of law we cannot see how it can be contended that the settler, who has been encouraged by the owner, the general government, to settle upon its lands, has no property interest in the grasses growing upon such lands.   Have the sheep owners the exclusive right to the grasses growing on the public lands, and the settler no right to the same?   The owners of sheep. do not permit them to roam at will, but they are under the immediate control of herders, who have shepherd dogs with them, and wherever they graze they take full possession of the range as effectually as if the lands were fenced.   The evidence in this case shows that appellant's herder, with his dogs, was chasing the cattle of respondent in the immediate vicinity of respondent's home.   It is a matter of common observation and experience that sheep eat the herbage closer to the ground than

cattle or horses do, and, their hoofs being sharp, they devastate and kill the growing vegetation wherever they graze for any considerable time. In the language of one of the witnesses in this case: "Just as soon as a band of sheep passes over, everything disappears, the same as if fire passing over it." It is a part of the public history of this state that the industry of raising cattle has been largely destroyed by the encroachments of innumerable bands of sheep. Cattle will not graze, and will not thrive, upon lands where sheep are grazed to any great extent.

The statutes in question make it a trespass for the owner, or person having the charge of sheep, to graze or herd them within two miles of the dwelling of another. These statutes make it a nuisance to graze or herd sheep within two miles of another. As a penalty for committing such trespass, the trespasser must pay to the injured party all damages that he has sustained. This is in the nature of a penalty, and the only penalty prescribed in the statutes. The statutes recognize a property interest in the grasses growing on the public domain, within two miles of the dwelling of a settler, in common with others, but exclusive as against the owners and herders of sheep, who are prohibited from grazing or herding sheep within two miles of inhabited dwellings. Can it be said that the settler is not injured when sheep are herded and grazed all around his home, and the vegetation thereby destroyed? His injuries, so far as the grass alone is concerned, depends upon circumstances. If he only has one cow to pasture, he is not damaged or injured as much as if he has ten. He may be damaged by having to smell dead sheep, or by having to use water polluted by them, or by actual injury to his own land or improvements by reason of sheep being grazed or herded thereon. The smell of sheep is offensive to many persons, and especially so where they are herded in large bands. Our legislature, in section 3620 of the Revised Statutes of 1887, has defined a nuisance as follows: "Anything which is injurious to health or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property," etc. If large bands of sheep are permitted to be herded

or grazed around the yards and homes of settlers, it would certainly interfere with their comfortable enjoyment of life and property. It is a matter of common experience that a large band of sheep to the windward affects one's sense of smell when at a considerable distance away. It is argued by appellant that the statutes in question arbitrarily fix the distance at two miles from inhabited dwellings, within which sheep may be grazed or herded, and that this provision is arbitrary and unreasonable. The same objection could be made if the distance was fixed at two feet, or two hundred feet, or two hundred yards, instead of two miles. We think the proper bounds within which sheep should not be grazed or herded, with relation to the homes of others, is a matter of legislative, and not judicial, discretion. The legislature, being authorized to prohibit the running at large of sheep, are authorized to prohibit the grazing or herding the same within two miles of inhabited dwellings, and this court is not authorized to disturb the legislative decision in this respect. It is true that the statutes in question interfere to some extent with the raising of sheep, but they apply to all people in the same class, and as to whether the public generally shall suffer inconvenience, or whether the sheep owners and sheep herders shall be inconvenienced, is a matter for legislative determination. Mr. Tiedeman, in his work on State and Federal Control of Persons and Property, at page 732, speaking about the principle in question, very tritely, and we think correctly, says. "It is clearly within the legislative discretion to determine whether the private interest or the public good shall yield in a case where the two are antagonistic, and to prohibit or permit the doing of what promotes the public welfare, and at the same time causes personal discomfort or injury; and its judgment cannot be subjected to a review by the courts. The courts cannot reverse the legislative decree in such a case; it is not in any sense a judicial question. But the police power of the legislature, in reference to the prohibition of nuisances, is limited to the prohibition or regulation of those acts which injure or otherwise interfere with the rights of others." In accord with this wise principle, we think that it is competent for the legislature to promote the welfare of the public by providing that sheep

shall not be herded or grazed within two miles of inhabited dwellings. These statutes were not intended to prevent owners from grazing sheep upon their own lands, although situated within two miles of the dwelling of another. The evidence in the case of *Sifers v. Johnson, supra,* summarized in the opinion, shows conditions under which isolated settlers would have to live if no protection was afforded them by law. After a full consideration, we are compelled to reaffirm the validity of the statutes in question, and affirm the decision of this court in *Sifers v. Johnson, supra.*

It is contended that the evidence does not support the verdict, but this contention is principally based upon the idea that destroying grass on the public domain, within two miles of a settler's dwelling, by herding and grazing sheep thereon, does him no injury for which he can recover damages. What we have hereinbefore said disposes of this contention against the appellant. We have carefully examined the evidence in the case, and, while we find it conflicting, yet we find evidence supporting the verdict. Plaintiff stated that the damages to his own land, by reason of appellant's sheep being herded and grazed thereon, and destroying the grass, amounted to fifty dollars; that, by reason of the grass being destroyed in the vicinity, and within two miles of his dwelling, he was compelled to go frequently from two to five miles to look after his cattle, to his injury in the sum of fifty dollars, and was compelled to pay sixty dollars for hay, which he would not nave had to purchase but for the destruction of said grasses by said sheep. The verdict was for $100, and the jury evidently believed and accepted the evidence of the respondent, and based their verdict thereon, which, under former decisions of this court, we cannot disturb.

One of the errors assigned is that the court permitted the witness Ireton to answer the following question: "Q. Taking as the fact that he had the amount of stock that he testified to upon the stand, what damage could have been done to him this year by reason of the grass having been eaten off on his uninclosed land west of his dwelling-house, and on the public domain within two miles west of his dwelling-house?" In answer to the objection, the court said: "He may answer if he

knows." The witness then answered: "Well, at a low estimate, I would think $100." On cross-examination, the witness stated that his estimate was a mere honest guess, but appellant did not move to have the answer to the aforesaid question stricken out. We do not think that the action of the court in permitting him to answer the question, being restricted by the court to his own knowledge, was error. A motion to strike said answer would have been proper, and, if made, should have been sustained. It is also shown in the evidence that the sheep of one Frank Manville were herded and grazed within two miles of the dwelling of the respondent. But the evidence of respondent was directed to the damage done by the sheep of appellant during the fifty days that they were herded and grazed on his land, and around his home, in the spring, and to that done by them on their second trip in the fall. Of course, under the law, appellant is not responsible to respondent for damages sustained by the latter by reason of the trespassing of sheep of other people.

The statutes in question give to the injured party double damages for the second trespass. Respondent testified that the injury to his own land, by reason of its being injured while wet and covered with soft snow, and washing in gullies as a result thereof, was $200. This evidence was taken from the jury by the court on the idea that it was not specifically alleged in the complaint. Under the denials in the sixth paragraph of the defendant's answer, we think that said evidence was within the issues raised, and that same should not have been taken from the jury, but, as respondent has not appealed, that error is of no avail, and we only refer to it for the purpose of showing that the actions and rulings of the district court complained of by the appellant were not prejudicial to him, and consequently do not authorize a reversal.

The judgment of the district court is affirmed. Costs awarded to respondent.

Sullivan, J., concurs.

STOCKSLAGER, J., Dissenting.—I cannot concur with my associates in this case. This suit involves the constitutionality

of section 1211 of the Revised Statutes of the state of Idaho. This statute has been upon the statute books of the state for a number of years, and has been practically a dead letter until within the last two years, seemingly conceded by bench and bar to be void. The only theory upon which it is assumed to sustain this exceptional statute is that it is a legitimate exercise of the police power of the state. It is assumed that it was passed as a police regulation. Within certain lines and limitations, the police power of the state may undoubtedly control the affairs within the state in the interests of the peace, morals, good order, and welfare of the citizens thereof. But it has never been held, and it would be not only a new, but a dangerous, precedent to hold, that, under the pretense of police regulation, you could give to one citizen an advantage over another . the mere matter of the use of the public domain, or in the mere matter of general privileges and advantages.

In the case of *New Orleans Gaslight Co. v. Louisiana Light etc. Mfg. Co.*, 115 U. S. 650, 6 Sup. Ct. Rep. 252, 29 L. ed. 516, Mr. Justice Harlan, said: "The definition of police power must be taken subject to the conditions that the state cannot in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land." Again, it is said in the case of *Ex parte Whitwell*, 98 Cal. 73, 35 Am. St. Rep. 152, 32 Pac. 871, 19 L. R. A. 727: "If a statute purporting to have been enacted to protect the public health, public morals, or the public safety has no real or substantial relation to those things, or is a palpable invasion of rights secured by fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution." Quoting again from the supreme court of the United States, in *Lawton v. Steele*, 151 U. S. 133, 14 Sup. Ct. Rep. 499, 38 L. ed. 385, it said: "To justify the statute in thus interposing its authority in behalf of the public, it must appear that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonable, and necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under

the guise of protecting the public interest, arbitrarily interfere
with private business, or impose unusual and unnecessary re-
strictions upon lawful occupations. In other words, its deter-
mination as to what is a proper exercise of its police power is
not final or conclusive, but is subject to the supervision of the
courts."

It is apparent, therefore, that if this statute is in fact not an
exercise of the police power of the state, but an attempt, under
the guise of police power, to unnecessarily interfere with in-
dividual rights, and to give to certain individuals certain rights
and privileges not allowed to others, it cannot be sustained.
Or if, by reason of the statute, equal protection of the law is
denied, then it is in violation of the fourteenth amendment of
the constitution of the United States, and in the language
of Justice Harlan, just quoted, "is a palpable invasion of the
rights secured by the fundamental law."

Is it because the morals of the community are imperiled that
this law has been resurrected from its sleep of years, or is it
because it is deemed an inconvenience to other industries to
have sheep grazing upon certain parts of the public domain?
Is it an exercise of the police powers of the state to say that,
when the horses eat the grass upon the public domain, it has
no value, and the resident cannot recover the value thereof,
while, if sheep eat it, it has a value, and the resident can re-
cover the value of the same? Undoubtedly, residents can and
should recover for trespasses upon their individual lands, but
here is a statute which gives damages because of the eating of
the grass upon the public domain, provided the eating is by
sheep. Is this a police regulation, or an attempt to fence off
by statute a certain portion of the public domain for the con-
venience of cattlemen, horsemen, or ranchers, or anyone except
owners of certain kinds of herds?

The opinion of the majority of the court is to the effect that
not only may you prohibit sheep from grazing within two miles
of a residence, but the resident is entitled to the value of the
grass which may be destroyed or eaten by sheep within two
miles of a residence, although this grass be growing upon pub-
lic domain. It is certainly clear to the unprejudiced mind that

this grass does not belong to the resident, or to any other stock men. They have no property interest in it whatever. Yet here is a statute by which they may sue and recover the value of that which does not belong to them, and in which they have no interest. It belongs to the government, which, by license, all are permitted to enjoy; yet this statute, as now construed, permits parties to recover the value thereof (the grass), although it is not his, and never was, and permits him to recover it, not from anyone who may take it, but from the sheep-men alone. Any other individual may graze it off, cut it off, burn it off, and the resident cannot complain; but, if a sheep owner takes it, it immediately has a value to the resident, and he is entitled to recover the full price thereof. I do not think that this is in any sense a police regulation, or equal protection under the law. It is the most vicious form of class legislation, and it will not do to call such apparent violation of the fundamental rules of right a legitimate exercise of the police power of the state. Classifications, when made, must be based upon some rule of substantial difference which of itself naturally makes the distinction.

In a very recent decision of the supreme court of the United States (*Railroad Co. v. Ellis* 165 U. S. 150, 17 Sup. Ct. Rep. 255, 41 L. ed. 666), it is said: "Classifications cannot be made arbitrarily. The statute cannot say that all white men shall be subject to the payment of attorney's fees of parties successfully suing them, and all black men not. It must not say that all men of a certain age shall be alone thus subjected, or all men possessed of wealth. These are distinctions which do not furnish any proper basis for the attempted classification. That must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily, and without such basis. No duty rests more impressively upon the court than the enforcement of this constitutional provision intended to secure that equality of rights which is the foundation of our government." To the same effect, see Cooley's Constitutional Limitations, sec. 391; *People v. Gillson,* 109 N. Y. 389, 4 Am. St. Rep. 465, 17 N. E. 343.

Now, let us concede, for the sake of argument, and to meet one statement in the majority opinion, that the smell of sheep might be offensive to some people, and that it might be said that their grazing near a resident would for other reasons be offensive. All this may be granted; yet where is the distinction so far as the value of the grass is concerned? The legislature might say that, by reason of their smell, they should not come within a certain distance of a residence; but this statute goes further, and says that they cannot only not come there, but that if they eat the grass while there, the resident owner may recover the value thereof. Now, as a matter of police regulation, how can the value of the grass be fixed or taken away because of the offensive odor of the animal which eats it? We point to these things for the purpose of showing that this statute is not designed simply to protect those who might deem it offensive to have sheep near them, but is designed simply to give an advantage upon public domain. It is an effort at class legislation, and, if it can be established with reference to sheepmen, there is no reason why the legislature cannot proceed further, and proscribe any particular industry that it sees fit to proscribe. I am clearly of the opinion that such law is unconstitutional and void. I am further of the opinion that, in any view of the law, it was never the design of the legislature to provide, as an element of damages under this law, the value of the grass upon the public domain, and that such law does not permit the recovery, as an element of damages, of the value of the grass which belongs to the government.

There is another feature of this case, which it is not necessary to discuss at length; but it clearly appears in the record that, prior to the time that the sheep of the defendant went upon the ground, other sheep had, the same season, and shortly before, crossed over the same ground. Witness for the plaintiff testified that, by reason of their passing over the ground, the grass is entirely destroyed; yet this plaintiff is permitted to recover, from the owner of the band of sheep which came after the destruction, for the value of the grass. In other words, this law, which is exceptional and unusual in itself, is so construed as to permit of the most pronounced injustice being done

the sheep owner, as it permits the recovery of damages whether his herd did the damage or not, and for grass which does not belong to the man who is bringing the suit.

### ON REHEARING.

SULLIVAN, J.—A petition for a rehearing has been filed in this case, and it is therein contended that as the raising of sheep is a legitimate and lawful industry, and not criminal in its nature, the legislature cannot, under the guise of police power, regulate and control it so as necessarily to interfere with its pursuit, unless such interference and control are absolutely essential to the peace and good order of the community. And it is conceded that the legislature may go to almost any extent in dealing with persons who are doing things which are nuisances *per se,* or pursuing avocations hurtful or criminal *per se*. And it is contended that the proof must be much stronger, the necessity much more clearly established, in the one case than in the other. Counsel also contends that there is nothing to disclose a necessity for controlling the sheep business, in any manner, by police regulations; that this attempt to regulate and control it—burden it by the law under consideration—is simply an effort on the part of the legislature to give a part of the public domain to settlers, or to other classes of stockmen, under the guise of police regulations.

We cannot agree with those contentions. That sheep-raising is a legitimate industry in this state is not questioned and it is well known that it is one of the great industries of the state. From the information that we have, we think that there are at the present time 3,000,000 of sheep now feeding in this state. Blaine county alone has over 600,000 sheep assessed within its borders this year (1902). A large amount of capital is invested in that business, and the sheep owners of the state are thoroughly organized, energetic, and very watchful of their interests in this state. But it is too well settled to require citation of authorities that, in every state of this Union, the keeping and management of livestock is under police regulation. (2 Tiedeman's State and Federal Control of Persons and Property, 838.) That authority states, on page 838, as follows: "The

clash of interests between stockraising and farming calls for
the interference of the state by the institution of police regu-
lations, and whether the regulations shall subordinate the stock-
raising interest to that of farming, or *vice versa*, . . . . is a
matter for the legislative discretion, and is not a judicial ques-
tion."

The history of this state for the past twenty-five years, shows
that the encroachment of the sheep industry on that of the
cattle industry has virtually driven the cattle industry, as it
was conducted fifteen or twenty years ago, out of the state;
that frequent conflicts occurred between sheep and cattle men,
resulting in serious breaches of the peace, in which many human
lives have been lost. Many of those occurred prior to the ad-
mission of Idaho to the Union of states, in 1890, since which
time the population has more than doubled, and much of the
public land within the state has been settled upon, and is
now occupied by small farmers, each usually holding one hun-
dred and sixty acres of land. And the clash now is between
the sheep-men and the farmer, and, as stated by the authority
above cited, the keeping of livestock is under police regulation,
and when there is a clash of interests, as between stockmen
and farmers, it is within the discretion of the legislature to
subordinate the sheep industry to that of farming, as has been
done in this state. As to which one of the two industries shall
be made subordinate is a matter of legislative discretion, and is
not a judicial question. The legislature has virtually declared,
in the sections of the statutes under consideration, that the
sheep industry shall be subordinate to that of farming, and,
in case of hardship to that industry under the law, the legis-
lature only has the power to remedy the matter.

This court cannot set up its judgment, against that of the
legislature, as to the wisdom of the enactment of said law. The
legislature no doubt did, as it had a right to do, consider the
peace, quiet, and comfort of the small farmers of the state, and
legislate in their interest, as against the rights of sheep owners
to graze and herd their large flocks of sheep in close proximity
to the farmer's habitation. The clouds of dust raised by large
flocks of sheep in and about one's residence in this desert coun-

try are unquestionably offensive to the senses, and might be injurious to health. And as to the contention that the legislature cannot, under the guise of police power, regulate and control a legitimate industry unless it is absolutely essential to the peace and good order of the community, we would say that where there is an irreconcilable difference (conflicts all over the state) between two legitimate industries; where the peace and good order of the community has often been broken by clashes between representatives of such industries; and where the history of the state clearly shows that the comfort of many of the residents of the state is interfered with by herding and grazing flocks of sheep near their habitations—those facts are proof sufficient to show that it is absolutely essential to the peace, good order, and comfort of many of the residents of the state for the legislature to regulate such industry. That being true, then as to whether police regulations shall be passed is a matter for legislative discretion, and is not a judicial question.

If there be hardship or injustice in the law, it must be relieved by legislative enactment. While, personally, I think the limit of two miles in each direction from an inhabited dwelling, as provided by said law, is greater than is absolutely necessary to protect the inhabitant, I cannot, for that reason, set my opinion against that of the legislature, and hold the law unconstitutional, as it is settled by competent authority that, in such a case, it is a matter of legislative discretion, and is not a judicial question.

As to said act being class or special legislation, I do not think there is anything in that contention. It is well settled that a law is not special in character "if all persons subject to it are treated alike, under similar circumstances and conditions, in respect both of the privileges conferred and liabilities imposed." (*Missouri Pac. Ry. Co. v. Mackey*, 127 U. S. 205, 8 Sup. Ct. Rep. 1161, 32 L. ed. 107.) It cannot be seriously contended that said law is class legislation because it does not include cattle and horses, as well as sheep, as the habits and nature of the animals, their effects on the land on which they graze, are not the same. However, the law under consideration treats

all sheep-men alike, under similar circumstances and conditions, in respect both of the privileges conferred and the liabilities imposed, and is, for that reason, not class legislation—no more than the law not requiring one to fence against hogs is class legislation against the hog grower; nor does that deny him equal protection under the law. The statute in question affords the same protection to the sheep raiser as it does to other citizens. It protects him against the nuisance of having lands around his dwelling used as herding or grazing grounds for sheep. That statute is general in its terms, and affords protection for all and to all alike.

The giving of damages for the destruction of grasses on the public domain, by sheep within two miles of the dwelling of a settler, is not based upon the idea that the settler has a vested property right in such grasses. The settler is permitted, under the law, to recover such damages as a penalty against the petitioner, because the latter has done that which the law forbids and makes unlawful. The legislature saw fit, in its wisdom, to fix the amount of damages thus sustained as the measure of the penalty for such violation, and also gave the penalty to the party injured, instead of turning it to the general school fund, or otherwise applying it. Instead of fixing the penalty at any certain sum, as the legislature had a right to do, and might have done, the penalty was fixed at the actual damage sustained by the citizen, and such penalty was given to the injured party instead of turning it into the county or state treasury. It often happens that the informant in a penal or quasi penal action is given part or all of a certain sum assessed as penalty against the transgressor. For instance, we have a statute which makes it unlawful for a public officer to charge or collect illegal fees, and provides that the informant shall, on conviction of the officer, recover from the latter $500. And we have other statutes that provide, on conviction of the offender, the informant shall receive one-half of the fine imposed. Such laws are held valid, and not in conflict with any of the provisions of the fourteenth amendment of the federal constitution in any respect, and do not deprive one of property

without due process of law, and do not deny to anyone the equal protection of the law.

Said statute was not framed on the idea that the settler has a vested right in the grasses growing on the public domain, but upon the theory that one who violated said law should pay as a penalty for his unlawful act all damges that a settler had sustained by reason of such violation. And if, by reason of such unlawful act, the settler was damaged by sheep eating the grass which the farmer's stock would have subsisted upon, that damage is a part of the penalty that the law assesses against the transgressor of the law. It is contended that said law is a mere guise to give the value of the grass on the public domain, or the value thereof, to the settler. We do not think so. While it does that very thing, we think, in the development of the state, it is more important that the state be settled by farmers seeking to secure·for themselves, and those dependent on them, homes, than it is that the state be turned over to a few large sheep owners. It is more important that the public lands of this state be settled upon, and held in small tracts, such as the land laws of Congress permit the settler to acquire title to, and which is being done, than to have said lands devoted exclusively to the grazing and herding of sheep owned by comparatively a few men. The rearing and education of good citizens is of more importance to the state than the raising of sheep.

Said law is a valid police regulation, and enacted for the purpose of preserving the peace—preventing conflicts—and tends to the good morals and comfort of the farmers of the state, its settlement, and the prosperity and happiness of a large majority of the citizens of the state, and was not enacted for the purpose only of giving the grass, or its value, to the settler, within the limit of two miles from his habitation, as contended by the petitioner. Cattle, horses, and other stock of sheep owners and others may consume the grass within that limit, and the settler has no remedy under the law. The sheep owner may sell his sheep, and purchase and graze his cattle to the very door of the settler, if such door is in the public domain, and the settler is remediless. But, in case the legislature saw fit to

restrict such grazing of cattle, it may do so. So far as the public domain of the United States, in this state, is concerned, it is under the police regulations of the state, and governed thereby, the same as the lands of the citizen, wherein such laws or regulations are not in conflict with the federal constitution, or the laws of Congress, and, until Congress provides by law that sheep shall not be restricted by state laws from grazing everywhere upon the public domain, the state, by proper legislation, may regulate and control that matter.

It is contended that, prior to the time the sheep of appellant passed over the land referred to, other sheep had grazed over the same, and that it is clearly apparent from the evidence that the appellant, who was defendant in the court below, was made to pay the entire damage done for the entire season. It certainly would be unjust to compel the appellant to pay damages done by other people's sheep. The law only requires the owner to pay the damages done by his own sheep. The evidence shows that the appellant established his sheep camp on the fourth day of April, 1901, on the west fork of Soldier creek, about three-fourths of a mile above respondent's residence; that said creek ran near said residence, and that appellant kept his camp there until the 17th of May following, when he moved his sheep four or five miles away. The respondent testified that during that time he did not think said sheep ranged farther than a mile and a half away from his land, and that they bedded about three-fourths of a mile above his house, at said camp; that he supposed there were about 2,500 of said sheep. The herder, however, testified that he only took between 700 and 800 sheep there, and the appellant testified to the same effect. The evidence shows that said sheep remained there from April 4th to May 17th, and that, on October 4th following, the appellant returned there with between 2,000 and 3,000 sheep, and respondent estimates his damage in October to be twenty-five dollars, and for the grass eaten from his individual land at sixty dollars, and fifty dollars for appellant grazing his sheep on the public domain, outside of his individual land prior to October, making a total of $135. The respondent had about twenty head of cattle and some horses. It is shown that other sheep

passed over said land. Respondent testified as follows: "I do not mean to say that there were no other bands of sheep running through there this year. There were other sheep upon my land about the same time. They were Newman's. I went and notified him, and he got out." And Frank Manville testified that in 1901 he ranged his sheep around in the vicinity of respondent's ranch. From all of the evidence, it appears that Manville had sheep in the vicinity of respondent's ranch on the opposite side from where appellant's camp was located; that on or about the 25th of April he had a conversation with respondent, and there is a conflict in the evidence as to what was said in that conversation. It appears that Manville was intending to move his camp to within a half a mile of respondent's west line, and about a mile below the camp then occupied by appellant. The result was that Manville, on the 15th of May, moved his camp to within a half a mile of respondent's west line, and below his house, and two days later, on May 17th, appellant moved his camp four or five miles from respondent's ranch. Manville remained at his camp, so established, until the 9th of June. I gather, from all of the evidence, that Manville and appellant did not occupy the same range at the same time. At least, up to May 15th, Manville's sheep had ranged on the easterly side of respondent's ranch, and appellant's on the westerly side thereof. While Manville's ranged to some extent, at least, within two miles of respondent's dwelling-house, the evidence clearly shows that appellant's sheep ranged on, in, and around respondent's ranch, on the westerly side, from April 4, to May 17, 1901, and returned there October 4th, following, and remained there until this suit was brought on October 18, 1901. Considering all of the evidence, and the number of cattle and horses that the respondent had, and the ranging and grazing of appellant's sheep on and about respondent's land from April 4th to May 17th, we can but conclude that the evidence sustains the verdict of the jury, and that he suffered damages in the sum of $100 from the grazing of appellant's sheep on respondent's land, and within two miles of his dwelling.

When the penalty for the violation of said law is sought to be increased by reason of the destruction of grasses on the public domain, it must be shown to a reasonable probability, at least, that the settler's stock would have gotten the benefit of such grass, or he cannot recover therefor, and one sheep owner cannot be held for damages done by the sheep of another.

But in the case at bar, I think, from all of the evidence, the verdict of the jury is fully supported by it, and the petition for a rehearing is denied.

Quarles, C. J., concurs.

Stockslager, J., dissents.