JOHN ANSOLABEHERE, Appellant, *v.* ST. JOHN
LABORDE, Respondent.

No. 3955

April 25, 1957                                310 P.2d 842

*Orville R. Wilson,* of Elko for Appellant.

*Bradley & Grubic* and *John S. Belford,* of Reno, for
Respondent.

## OPINION

By the Court, Badt, C. J.:

This appeal requires our approval of one, and our
rejection of the other, of the two diametrically opposed

concepts advanced by the respective parties as to the jurisdiction and power of the state to regulate the grazing use of those parts of the public domain available and accessible to the livestock of owners of stockwatering rights thereon. We have concluded that those features of the state statute governing the grazing use of the public lands were superseded and rendered ineffective by the enactment by Congress of what is known as the Taylor Grazing Act, 43 U.S.C.A., sec. 315 et seq.

Plaintiff's complaint is patently and directly predicated upon what is known as the 1925 stockwatering act. NRS 533.485–533.510, 1925 Stats. 348. The act is entitled "An Act relating to the use of water for watering livestock, the acquisition and proof of the right to such use, making certain actions a misdemeanor and prescribing a penalty therefor." The preamble recites the great importance to the state of the use of water for watering range livestock; the fact that the value of such water right is directly dependent upon the availability to the owner of such right, of the grazing use of the public range in the vicinity of his watering place; and the fact that the existence in separate owners of two or more rights for watering range livestock in the same vicinity tends to produce controversies concerning the use of the public range that often result in breaches of the peace. "Public range" is defined to include all lands belonging to the United States on which livestock are permitted to graze, including lands in the national forests and reserved for other purposes. "Range livestock" are defined to be stock subsisting chiefly or entirely on the public range during the season when they are being watered there. NRS 533.490 declares such use to be a beneficial use, and subsection 2 thereof provides that it shall be a sufficient measure of the quantity of the water to specify the number and kind of animals to be watered. NRS 533.495 reads as follows: "Whenever one or more persons shall have a subsisting right to water range livestock at a particular place and in sufficient numbers to utilize substantially all that portion of the public range readily available to livestock watering at that place, no appropriation of water from

either the same or a different source shall subsequently be made by another for the purpose of watering range livestock in such numbers and in such proximity to the watering place first mentioned as to enable the proposed appropriator to deprive the owner or owners of the existing water right of the grazing use of such portion of the public range, or substantially to interfere with or impair the value of such grazing use and of such water right."

NRS 533.505 reads in part as follows: "Any person who, without the right so to do, shall, on two or more separate days during any season, water more than 50 head of livestock at the watering place at which another shall have a subsisting right to water more than 50 head of livestock, or within 3 miles of such place, with intent to graze the livestock so watered on the portion of the public range readily accessible to livestock watering at the watering place of such other person, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $500, or by imprisonment in the county jail not exceeding 6 months, or by both fine and imprisonment."

Plaintiff alleged that he owned and was entitled to the use for stockwatering purposes of water rights described as follows: "(1) Upper Laborde Spring, Certificate No. 1004, Year of Priority—1917, Sufficient water to water 2,500 sheep from April 1st to October 1st of each year. (2) Lower Laborde Spring, Certificate No. 1004, Year of Priority—1917, Sufficient water to water 2,500 sheep from April 1st to October 1st of each year. (3) Unknown Name Spring, Proof No. 01719, Year of Priority 1890, Sufficient water to water 2,500 sheep and 200 cattle from April 1st to October 1st of each year. (4) China Springs, Proof No. 01149, Year of Priority 1882, Sufficient water to water 2,500 sheep from April 1st to October 1st of each year." It is important to note the allegation as to sufficient water for an aggregate of 10,000 sheep and 200 cattle.

He alleged that these stockwatering rights were established on the open, public range in an area embracing Township 21 North, Range 44 East, M.D.B. & M., that

he had a current, valid Taylor grazing permit "and sufficient livestock to fill said permit, to utilize substantially all that portion of the public range readily available to livestock watering at the aforesaid stockwatering places." His ownership of the described water rights, that they were upon the public domain and that he had a Taylor grazing permit were not denied. Plaintiff then alleged that defendant, without ownership of 1 stockwatering rights in the area, violated the terms of the stockwatering act "by watering on more than one occasion in 1954 more than 50 head of his livestock without the right to do so, or within three miles of each of the aforementioned stockwatering places owned and controlled by plaintiff"; that defendant threatened to continue "to trespass on plaintiff's aforementioned water rights" to plaintiff's irreparable damage etc. and prayed for an injunction enjoining defendant "from trespassing upon and interfering with plaintiff's water rights as hereinabove described and from in any manner obstructing or preventing the exercise of plaintiff's rights as set forth hereinbefore."

As affirmative defenses, defendant alleged his ownership of four ranches in the county situated in Nevada Grazing District No. 6, Bureau of Land Management, Department of Interior, with grazing rights to run 1,166 head of cattle on the public domain pursuant to action of the Bureau under the Taylor Grazing Act and that he had been issued a permit to run 350 head of cattle from the Caton ranch and 150 head of cattle on the Silver Creek Drainage "as a drift"; that Silver Creek Drainage is the area in which plaintiff's said springs are situated and that defendant's cattle could not be grazed in the Silver Creek Drainage without using said springs; that if deprived of the use of said springs he would suffer irreparable damage and would have no area in which to run approximately 500 head of cattle; that by an injunction of his use of the springs the court would be controlling the public domain owned and controlled by the federal government. As a separate affirmative defense he alleged that as the waters and range

area were entirely within Nevada Grazing District No. 6, Bureau of Land Management, Department of the Interior, the court had no jurisdiction over the subject matter of the action or to grant the relief demanded. He further pleaded that he and his predecessors since 1900 had run 500 head of cattle on the Silver Creek Drainage, watering them at the springs claimed by plaintiff, had made concurrent use of the said springs and had a vested right to the use thereof. He pleaded separately a prescriptive right to use the springs. His answer contained no prayer for relief.

His defense of the lack of the court's jurisdiction is predicated upon the contention that when the United States, the owner of the said public lands, entered upon the control and administration thereof through the act of Congress known as the Taylor Grazing Act, those features of the 1925 stockwatering act having to do with the control of grazing rights or privileges thereon were superseded and rendered ineffective. This contention must be sustained.

That act of Congress is entitled "An act to stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes." 43 U.S.C.A. sec. 315, 48 U.S.Stats. 1269, approved June 28, 1934. Section 1 provides that in order to promote the highest use of the public lands the Secretary of the Interior is authorized in his discretion to establish grazing districts. It also provides: "Nothing in this Act shall be construed in any way to diminish, restrict, or impair any right which has been heretofore or may be hereafter initiated under existing law validly affecting the public lands * * *." Section 2 requires the Secretary to make provision for the protection, administration, regulation and improvement of grazing districts thus created and to make such rules and regulations and establish such service as may be necessary to accomplish the purposes of the act and to insure the objects of such grazing districts, namely, to regulate

their occupancy and use and to provide for the orderly use, improvement and development of the range. Section 3 authorizes the Secretary to issue grazing permits to graze livestock on such districts upon the payment of reasonable fees. It then contains the following proviso: "That nothing in this Act shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacturing, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereafter initiated or acquired and maintained in accordance with such law." Section 16 of the act reads as follows: "Nothing in this Act shall be construed as restricting the respective States from enforcing any and all statutes enacted for police regulation, nor shall the police power of the respective States be, by this Act, impaired or restricted, and all laws heretofore enacted by the respective States or any thereof, or that may hereafter be enacted as regards public health or public welfare, shall at all times be in full force and effect: *Provided, however,* That nothing in this section shall be construed as limiting or restricting the power and authority of the United States."[1]

In the 30-odd years during which the Taylor Grazing Act has been in effect there has been no decision of any of the state courts of last resort or of any federal court which has been called to our attention determining the question raised by this appeal. Its necessary determination, however, has been foreshadowed many times. This court in In re Calvo, 50 Nev. 125, 253 P. 671, upheld our 1925 stockwatering law against the contention that the same encroached upon the power of the federal government to dispose of and make needful rules and regulations respecting the grazing lands belonging to the United States, and against the contention that the legislation attempted to fence off certain lands by statute

[1]Under 1946 Reorg. Plan No. 3, section 403, effective July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, 5 U.S.C.A., following sec. 133y—16, the functions of the grazing service and its director and assistant directors were transferred to the Bureau of Land Management.

and repudiated the state's contract with the federal government forever to disclaim all right to the unappropriated public lands lying within its borders. In so doing, it relied upon numerous cases sustaining the right of the state in an exercise of its police powers to make reasonable regulations as to the grazing of livestock, including the following: Pyramid L. & S. Co. v. Pierce, 30 Nev. 237, 95 P. 210 (statute making it unlawful to herd sheep within one mile of a bona fide ranchhouse); Sifers v. Johnson, 7 Idaho 798, 65 P. 709, 54 L.R.A. 785, 97 Am.St.Rep. 271 (statute prohibiting grazing of sheep on public domain within two miles of a residence); Sweet v. Ballentyne, 8 Idaho 431, 69 P. 995 (same statute); Walker v. Bacon, 11 Idaho 127, 81 P. 155, 114 Am.St.Rep. 262 (same statute), affirmed in Bacon v. Walker, 204 U.S. 311, 27 S.Ct. 289, 51 L.Ed. 499; Omaechevarria v. State of Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (statute prohibiting grazing of sheep on a cattle range). See also numerous other cases cited in the Calvo case, supra.

The important point to note, as specifically declared in many of the cases, and as implied in others, is the expression of the court upholding the police power of the state, extending over the federal public domain, "at least when there is no legislation by Congress on the subject." Bacon v. Walker, supra. Or as expressed in McKelvey v. United States, 260 U.S. 353, 43 S.Ct. 132, 135, 67 L.Ed. 301: "It also is settled that the states may prescribe police regulations applicable to public land areas, so long as the regulations are not arbitrary or inconsistent with applicable congressional enactments." But most convincing, and almost prophetic in view of its utterance eight years before enactment of the Taylor Grazing Act, is the statement of this court in In re Calvo, supra, in upholding the validity of the 1925 stockwatering act: "All that the state seeks to do pursuant to the statute is to exercise police regulations over the public domain. This it has a right to do, as we have shown. Furthermore, any time the federal government * * * in any * * * manner undertakes to exercise

control over it, the statute in question becomes inoperative insofar as it conflicts with the authority of the federal government." In 1936 this view was affirmed in Itcaina v. Marble, 56 Nev. 420, 55 P.2d 625, referring to the "sufferance of the federal government" or to its "implied license" under which the grazing of the public lands was permitted. This court there said: "It is not a right that the government of the United States has conferred, and these public ranges may at any time be withdrawn from such use or the use permitted only under government regulations, as in the case of forest reserves. Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618; Omaechevarria v. Idaho, 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; In re Calvo, 50 Nev. 125, 253 P. 671. However, in the absence of government regulations, the state may regulate the use of unreserved and unappropriated public domain within its borders."

Applying these holdings to the instant case we find (1) that appellant was grazing his livestock in the Silver Creek Drainage area pursuant to a permit granted by the Bureau of Land Management under rules and regulations promulgated by it under authority of the Taylor Grazing Act, and in so doing, was watering his cattle at the springs in question; (2) that respondent's complaint filed in the district court did not allege, nor did that court find, nor would such finding have been supported by the record, that respondent's livestock utilized or consumed all of the waters of said springs; (3) that the court did not find, nor would the record have supported such finding, that the watering of appellant's cattle at said springs would have deprived respondent's sheep of any water necessary for them to consume; (4) that there was, accordingly, surplus water in said springs over and above the stockwatering needs of respondent's sheep; (5) that, except as to regulation of the right to graze the surrounding public domain (validly regulated by the state until the effectiveness of its statute was destroyed by the Taylor Grazing Act) this

surplus was subject to appropriation by appellant; (6) that appellant's appropriation and use of such surplus, leaving ample water for the watering of respondent's sheep, did not and could not (in the ineffectiveness of the regulatory grazing provisions of the stockwatering act) work irreparable injury to respondent by depriving him of the right to water his sheep at said springs or by depriving such sheep of necessary stock water; (7) that there was an insufficiency of feed in the area involved, and that the regulation and administration of the grazing of livestock in the area so as to permit an orderly use of the area had been directly committed by Congress to the Secretary of the Interior and the Bureau of Land Management.

If we are correct in this analysis of the situation and if it would then appear that the Bureau of Land Management had granted permits that would "overobligate" the range, this is not a situation vesting or revesting jurisdiction in the state district court to effect a regulation of such use by enjoining appellant from the use of surplus water not put to a beneficial use by respondent, in effect preventing appellant from grazing his livestock upon the surrounding public lands.

That the State of Nevada, in the exercise of its police power, did effect a regulation of the use of the public domain in the enactment of the 1925 stockwatering law cannot be denied. It is just as clear that the Congress of the United States, in enacting the Taylor Grazing Act in 1934, vested full control of the use of the public domain in the Secretary of the Interior. The real problem that is presented grows out of (1) the recognition contained in the Taylor Grazing Act that nothing therein contained "shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agricultural, manufacturing or other purposes which has heretofore vested or accrued under existing law validly affecting public lands * * *"; (2) federal recognition of state ownership of non-navigable waters, and of the right of the several states to determine the method of obtaining from the

state the right to the use thereof;[2] and (3) the approval given by this court to the legislative theory of the 1925 stockwatering act and definitely tying the stockwatering right to the ownership of livestock that will graze the surrounding public lands. "The right to the use of water for watering livestock in this arid state depends for its value on the public range; hence we think the two matters are properly connected." In re Calvo, 50 Nev. 125, 253 P. 671.

Appellant categorically asserts that the Taylor Grazing Act superseded and overthrew the 1925 Nevada stockwatering act so far as it controlled the range as well as the water. Respondent as categorically takes issue "with appellant's basic premise that the 1925 water law can no longer be controlling. On the contrary, it is our contention that the 1925 water law is controlling."

A somewhat different expression of these diametrically opposed views is this. Respondent contends that the continued control of the use of stock water by the state (the right to the use of which stock water "depends for its value on the public range," In re Calvo, supra), while the federal government is exercising complete control over the surrounding public domain, presents a situation of the utmost confusion; that, adopting the language of Congressman Scrugham in the hearings upon the Taylor Grazing Act before the Public Lands Committee of the House of Representatives, such situation puts the average stockman in the State of Nevada in the anomalous position "of having his ranch owned by himself; the water used by his grazing stock controlled by the state and the grazing lands themselves

[2]Act of Congress July 26, 1866, 43 U.S.C.A., Sec. 661, 14 Stat. 251, Ch. 262, R.S., Sec. 2339; "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; * * *." United States v. Gerlach Livestock Co. (1949), 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231; California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356; Jennison v. Kirk, 98 U.S. 453, 25 L.Ed. 240; Broder v. Water Co., 101 U.S. 274, 25 L.Ed. 790.

controlled by two or more government bureaus. It puts the stock industry in trying position, just as though a man were in the teaming business, and his horse belongs to one man and his harness belongs to another, and his wagon belongs to another, and he had to get permission from each one to proceed with a job." Appellant sees no such resulting confusion, but an orderly process whereunder an owner's stockwatering rights are fixed and controlled by the state and his grazing rights fixed and controlled by the United States; that the orderliness of this distribution of authority is in no way disturbed by the fact that the measure of the stockwatering right is determined by the number of livestock watering at the particular source, and that its use is dependent for its value on the adjacent public range; that this is entirely in accord with the traditional, consistent and unbroken legislative and case history of water rights in this state, namely, that beneficial use shall be the basis, the measure and the limit of the right to the use of water.[3] NRS 533.035.

Another example of the complete divergence of the views of the parties is this. Support of an injunction restraining appellant from watering his livestock at the springs in question can, in appellant's view, be found only in proof that all of such water is necessary for the watering of respondent's livestock; that excess or surplus of water above such necessity is not being put to

---

[3]Applications to the state engineer for permission to appropriate the public waters of the state (for stockwatering purposes as well as for irrigation, power, etc.) are followed by proof of commencement of work, proof of completion of work, and finally by proof of application of the water to beneficial use. NRS 533.380. Prior to the Taylor Grazing Act federal permission to graze the public lands was not involved in the making of proof of application to beneficial use under stockwatering applications and could be made through the showing that a specified number of the applicant's sheep, cattle, etc. watered at the applicant's troughs, tanks, etc. and grazed the surrounding public domain. No confusion would be involved, following the initiation of federal control of the public lands, if the state engineer should require the final proof of application of the water to beneficial use to include a showing of a valid permit or license from the Bureau of Land Management. Without such permit or license the stock water could not be put to beneficial use.

a beneficial use and that the lawful use of such surplus cannot be restrained, as such restraint must be premised upon appellant's violation of respondent's stockwatering rights and not upon the grazing rights under the control of the Secretary of the Interior. Respondent, on the contrary, contends that the watering by appellant upon even a surplus of water in respondent's springs, with intent to graze the surrounding range, is so in violation of the state's stockwatering act, so in violation of stockwatering rights specifically preserved in respondent by the Taylor Grazing Act, that no legal effect can result from the attempt of the Bureau of Land Management to grant appellant a right to graze the area with stock that will water at the springs.

Likewise in the following respect are the views of the parties diametrically opposed. Respondent contends that the Taylor Grazing Act, recognizing as it does that it may not be administered so as to impair any right to the possession and use of water for stock water purposes vested or accrued under existing law validly affecting the public lands, must be confined to the administration of grazing lands which are in no way involved with the question of stockwatering rights. Appellant replies that it is not conceivable that such could be the intent of Congress, thus to vest in the control of the Secretary of Interior only the dry ranges of the western states, withholding from his control the administration of those well watered ranges with which the livestock industry is chiefly concerned. In this connection it may be accepted as a fact, of which this court may take judicial notice, that some portions of the public domain contain great amounts of grass, browse and other forage unavailable for use by livestock because of the absence of springs or streams upon which they may water; and that on the other hand there are large areas of the public domain upon which may be found numerous streams and springs providing ample water for livestock, but providing insufficient feed to support during the grazing season even a small proportion of the stock that could water in the vicinity. In other words, the basis of conflict

between two or more stockmen utilizing the public domain may on the one hand be shortage of stock water or may on the other hand be shortage of feed. It is evident to the court, both from the briefs and the record, that the present controversy rose out of shortage of feed.

With further reference to respondent's contention that administration and control under the Taylor Grazing Act must be confined only to the dry ranges where state stockwatering rights are not involved, we may note that the proviso upon which he relies not only protects such water rights theretofore vested or accrued under existing law validly affecting the public lands but also such rights "which may be hereafter initiated or acquired and maintained in accordance with such law." This in turn suggests a possible situation in which upon the dry ranges a livestock owner might obtain from the state engineer permission to appropriate underground waters by drilling and pumping or other development, and, upon proof of his obtaining a sufficient flow of underground water to water sundry given numbers of livestock, obtain from the state engineer his final certificate approving such water right. It is not fantastic thus to envisage providing ample stock water upon the dry ranges. Under respondent's theory this would leave virtually none of the public lands to the administration of the Bureau of Land Management. That the Congress or the United States courts would long tolerate such complete emasculation of the power and authority of the Secretary of the Interior to regulate the use of the public lands is hardly conceivable.[4]

[4]Congress enacted the Taylor Grazing Act after almost forty years of study of predecessor acts seeking to effect federal administration of the public lands in the several states. S. Rep. 1258, 73 Cong., 2d Sess., p. 2. Hearings, H. Com. on public lands on H.R. 2835 and 6462, 73d Cong., 2d Sess., p. 68. In Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399 (reversing Brooks v. Dewar, 60 Nev. 219, 106 P.2d 755, not upon the merits of the controversy as to whether the Secretary was violating the express terms of the act, but upon the ground that Congress had impliedly ratified the Secretary's actions) the United States Supreme Court sympathetically considered that years of experiment might be necessary before the Secretary could place the users of lands under term permits, and that

Respondent contends that the decision of the range manager was in error in granting any grazing right or privilege to appellant, and argues that the granting of such right or privilege was in contravention of sundry sections of the Federal Range Code, supporting these contentions by reference to testimony of the witnesses. Such contention is entirely one for consideration of the Bureau of Land Management and not a question for consideration or review by this court.

The trial court's abortive attempt to continue in effect the range regulatory provisions of the state stockwatering law by enjoining a trespass upon the stockwatering rights, irrespective of a surplus flow, arises, we think, out of a misconception. Under the stockwatering law the owner of a stockwatering right in the center

even for such extensive experimental periods it was not the intent of Congress that the grazing lands should go unregulated. That decision was rendered in May 26, 1941, at which time the Secretary of the Interior had been authorized to establish grazing districts not exceeding in the aggregate an area of 142,000,000 acres of the public lands. Id. note 4. Prior to the Taylor Grazing Act more than 15,000 persons had been using the public range for grazing more than 8,000,000 head of livestock annually under implied licenses. Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618. In the years following, the vast extent of the work done by the Director of Grazing and the Bureau of Land Management through a large force of expert personnel is a matter of common knowledge. The testimony of hundreds of persons, the compiling of a library of data, the expenditure of vast amounts of money, time, energy and skill in field examinations, the conducting of numerous hearings, the making of findings thereon, the adjudication of grazing rights on grazing areas both large and small, the determination of the carrying capacity of such ranges, the limitation and curtailing of the grazing use thereof to preserve the same from deterioration, the appraisal of the capacity of the "base properties" to carry the livestock in winter, all present a picture of the extent of wasted effort that would result from an adoption of respondent's views. As to the great numbers of personnel engaged, see Official Register of the United States, 1956, pages 379 and following. As to the vast extent of the operations of the Bureau of Land Management, see 1956 Annual Report of the Secretary of the Interior, page 235 and following. With reference to section 15 of the Taylor Grazing Act governing lease administration, it is stated: "In most states 95 percent or more of the total leasable acreage is now under lease and efforts are being continued to reach 100 percent. Respondent's theory would undoubtedly invalidate a great number of these leases.

of a range area carrying sufficient feed to maintain, for example, 100 head of cattle through the season was protected against a subsequent appropriation from that source or a subsequent use of water on that source by livestock which would graze that area. This quite conceivably was so, despite a sufficiency of water to water twice that many livestock. Beneficial use was made through the consumption of feed available to the stock watering at the source.[5] Any stockwatering use of the surplus by a second stockman would interfere with the beneficial use of the first appropriator, for the second appropriator's livestock would consume the feed, or part of the feed, to which the first appropriator's stock were entitled. But with the complete administration and control of the range vested in the Bureau of Land Management, the use of the public domain and the protection of one or more stock owners in such use was no longer within the power, authority or jurisdiction of the state authorities. There remained to them only the determination, protection and adjudication of water rights. Under any such determination or adjudication, protection would be afforded only to the extent of water being put to a beneficial use. Under Itcaina v. Marble, 56 Nev. 420, 55 P.2d 625, 629 (the Taylor Grazing Act not being then in effect), this court, in sustaining the lower court's injunction, frankly, openly and pointedly indicated that the injunction operated against defendant's use of the public domain. "Under [the provisions of the 1925 stockwatering act] by reason of plaintiff's subsisting right to the use of all of the waters in Hanks Creek Basin, he could not be deprived of the grazing use of any portion of the public range readily available to the plaintiff's cattle." As we have indicated, the relief attempted to be accorded in the present case was to all intents and pur-

[5]The state engineer's rule to the effect that the amount of water applied for or appropriated for stockwatering purposes could be measured by the number of stock to be watered does not affect the situation. It is simply a convenient measure instead of that used for other appropriations by cubic feet per second, acre feet, gallons per minute, etc.

poses the same. By reason of the Taylor Grazing Act, however, it was not available to respondent, and the district court was, therefore, in error in granting such relief.

Reversed with costs to appellant.

EATHER and MERRILL, JJ., concur.